A  assumption that under English law, at least in some cases, broad considerations of policy may be material in deciding on which side of the line his participation fell. If there has been no "knowing, deliberate, wilful quality" in his participation, the court may naturally be more reluctant to hold the director personally liable. Lord Salmon himself observed in the *Wah Tat Bank* case [1975] A.C. 507 that "each case depends upon its own particular facts."

B  I would prefer to leave further elucidation of the limits of the personal liability of directors to the trial judge by reference to the facts as found by him. For present purposes it will suffice to summarise my conclusions thus: (a) the facts as pleaded in the plaintiffs' statement of claim and further and better particulars are capable of founding a good cause of action against the appellant, if supported by evidence at the C trial sufficiently implicating him personally in infringements of copyright committed by the defendant company. (b) The appellant's submission that the plaintiffs must further allege and prove mens rea would afford him a wider exemption from liability for infringement than Parliament has seen fit to provide under sections 17(2) and 18(2) of the Copyright Act 1956; I can see no reason, on authority or principle, why he should enjoy such immunity if the facts pleaded in the statement of claim are D proved, though it is still open to him to rely on these two subsections for his own protection, if he so chooses.

For these reasons, I think the judge reached the right conclusion in refusing to strike out this particular action against the appellant. Despite Mr. Watson's very able argument on his behalf, I would dismiss this appeal.

E  O'CONNOR L.J.  I agree.

CUMMING-BRUCE L.J.  I agree.

> *Appeal dismissed with costs.*
> *Order for costs below to stand.*
> *Leave to appeal refused.*

F  *Solicitors: Dibb & Clegg with Ashwin White & Co., Barnsley; Broomheads & Neals, Sheffield.*

[Reported by ISOBEL COLLINS, Barrister-at-Law]

---

[HOUSE OF LORDS]

G  *\*In re* ASBESTOS INSURANCE COVERAGE CASES

1985  Feb. 6, 7, 11; 28          Lord Fraser of Tullybelton, Lord Wilberforce,
                                 Lord Keith of Kinkel, Lord Roskill and
                                 Lord Bridge of Harwich

*Evidence—Foreign tribunal, for—Jurisdiction of English court—Letters rogatory—"Particular documents specified in the order"—Request for production of classes of documents—Whether need for each* H  *document to be actual and identifiable—Examination of witness— Whether to be assumed that evidence relevant and admissible in requesting court—Evidence (Procedure in Other Jurisdictions) Act 1975 (c. 34), s. 2 (2)(a)(b)(4)(b)[1]*

In furtherance of litigation in the United States of America between the respondents, asbestos manufacturers, and insurers

---

[1] Evidence (Procedure in Other Jurisdictions) Act 1975, s. 2(2)(*a*)(*b*) (4)(*b*): see post, p. 336B–D.

Exhibit 3
Page 1 of 11

In re Asbestos Insurance (H.L.(E.))                    [1985]

or insurance brokers with whom they had policies to cover **A**
asbestos-related claims, the Superior Court of California at the
suit of the respondents issued letters rogatory requesting the
assistance of the High Court in securing the production of
documents by the corporate appellants, S., and the examination
of three individual appellants. McNeill J. ordered the three
individual appellants to attend before examiners to give oral
testimony and made an order against S. for the production of
certain documents, including the written instructions from the **B**
respondents or their agents to S. to obtain specified insurance
policies (paragraph (b) of the letters rogatory), the written
instructions to S. from the respondents or their agents to obtain
insurance policies during specified periods (paragraph (g)) and
the exemplars of an S. group company's excess comprehensive
personal injury and property damage "umbrella" liability policies
in use in the London insurance market during the period 1950
to 1966 (paragraph (j)). The Court of Appeal dismissed the **C**
appeals by the individual appellants and by a majority affirmed
McNeill J.'s order in respect of paragraphs (b), (g) and (j) of
the letters rogatory in S.'s case, allowing S.'s appeal in respect
of certain other paragraphs.

On appeal by S. and the individual appellants:—

*Held*, (1) allowing S.'s appeal, that "particular documents
specified in the order" in section 2(4)(*b*) of the Evidence **D**
(Procedure in Other Jurisdictions) Act 1975 was to be construed
strictly and so as not to permit mere "fishing" expeditions; that,
although several documents might be described compendiously,
the exact document in each case had to be clearly indicated and
the documents had to be actual documents shown to exist or to
have existed rather than conjectural documents that might or
might not exist or have existed; that paragraphs (b) and (g) of
the letters rogatory in S.'s case did not refer to particular **E**
documents and there was no evidence that there had usually
been a single document or set of documents by which written
instructions for policies from the respondents or their agents
had been transmitted to S.; and that paragraph (j) of the letters
rogatory referred not to particular documents but to a class of
documents that was not clearly defined (post, pp. 337D–E, H,
338B, D, H—339A, C–E, 340E—341A).

*In re Westinghouse Electric Corporation Uranium Contract* **F**
*Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C.
547, H.L.(E.) applied.

(2) Dismissing the appeal in the cases of the individual
appellants, that where letters rogatory requested the examination
of a witness on behalf of the applicant it was inappropriate for
the English court to consider in detail whether his evidence
would be relevant and admissible so far as the requesting court **G**
was concerned; and that, since each appellant admitted that he
was in a position to give some relevant evidence, the orders for
the taking of their evidence should stand (post, pp. 339F–H,
340E—341A).

*Per curiam.* The word "as" in section 2(4)(*b*) of the Act of
1975 appears to be a drafting error (post, p. 336F–G).

Decision of the Court of Appeal reversed in part. **H**

The following case is referred to in the opinion of Lord Fraser of Tullybelton:

*Westinghouse Electric Corporation Uranium Contract Litigation M.D.L*
*Docket No. 235 (Nos. 1 and 2), In re* [1978] A.C. 547; [1978] 2 W.L.R.
81; [1978] 1 All E.R. 434, H.L.(E.)

The following additional case was cited in argument:

*Penn-Texas Corporation v. Murat Anstalt* [1964] 1 Q.B. 40; [1963] 2 W.L.R.
111; [1963] 1 All E.R. 258, C.A.

Exhibit 3
Page 2 of 11

1 W.L.R.                    In re Asbestos Insurance (H.L.(E.))

A    APPEAL from the Court of Appeal.

By letters rogatory dated 13 December 1983, 6 February 1984 and 22 March 1984 respectively, the Superior Court of the State of California for the City and County of San Francisco, at the suit of the respondents, Fibreboard Corporation, Johns-Manville Corporation, GAF Corporation and Armstrong World Industries Inc., requested the examination of three witnesses, namely the three individual appellants, Philip Gerald

B    Crane, William Ernest Parton and David Murray Thistleton-Smith, and by letters rogatory dated 24 April 1984 it requested the production by the corporate appellants ("Sedgwick"), Sedgwick Group Plc., Sedgwick Overseas Group Ltd. and Sedgwick North America Ltd., of documents specified in the letters rogatory, namely (a) the excess insurance policies issued to the respondents by the various underwriting members of Lloyd's of London and the various British companies under the policy

C    numbers set forth in exhibit 1; (b) the written instructions from the respondents or their agents to Sedgwick to obtain those policies; (c) the written applications for insurance, slips and cover notes reflecting those policies; (d) the primary insurance policies issued to the respondents under the numbers and/or for the periods specified in exhibit 2; (e) the primary insurance policies issued to Johns-Manville Corporation by

D    Travelers Indemnity Co. under the numbers listed in exhibit 3; (f) the excess insurance policies covering personal injury and property damage liability issued to the companies and during the periods set forth in exhibit 4; (g) the written instructions to Sedgwick from the respondents or their agents to obtain those policies; (h) the written applications, slips and cover notes reflecting those policies; (i) the written instructions to

E    Sedgwick from the respondents or their agents to notify the insurers of their claims under the policies set forth in exhibit 1 and the written notifications of such claims of Sedgwick to the insurers; (j) the exemplars of Price, Forbes & Co. Ltd.'s excess comprehensive personal injury and property damage "umbrella" liability policies in use in the London insurance market during the period 1950 to 1966 and the written materials explaining and commenting on the exemplars given by Price

F    Forbes to parties to whom Price Forbes had given such exemplars; (k) a copy of a letter dated 22 April 1983 from Mr. Philip Crane of Sedgwick North America Ltd. to Mr. K. Rayment and all attachments thereto; and (l) copies of the communications from North American claims counsel for the underwriters identified in that letter and the attachments thereto.

G    In the cases of the three individual appellants, Master Lubbock, Master Hodgson and Master Bickford Smith respectively made ex parte orders for their attendance to give testimony. Summonses for those ex parte orders to be set aside were adjourned to McNeill J., as was also the inter partes summons in the case of the letters rogatory addressed to Sedgwick. Before McNeill J., paragraphs (k) and (l) of the letters rogatory were not pursued by the respondents. Paragraphs (a), (d), (e)

H    and (f) were not opposed by Sedgwick, nor were the "slips and cover notes" in paragraphs (c) and (h). McNeill J. on 25 July 1984, disallowed paragraph (i) and the second part of paragraph (j). He upheld the ex parte orders for oral testimony. On appeal by the individual appellants and by Sedgwick as to paragraphs (b) and (g), the first part of paragraph (j) and the remainder of paragraphs (c) and (h) of the letters rogatory, the Court of Appeal on 20 November 1984 dismissed the individual appellants' appeals and (Slade L.J. dissenting) disallowed paragraphs (c)

Exhibit 3
Page 3 of 11

Case 3:18-cv-00326-HZ    Document 53-3    Filed 07/16/18    Page 4 of 11
334

In re Asbestos Insurance (H.L.(E.))                    [1985]

and (h) only of the letters rogatory in Sedgwick's case. They refused the
appellants' application for leave to appeal.

On 5 December 1984 the Appeal Committee of the House of Lords
(Lord Fraser of Tullybelton, Lord Roskill and Lord Brandon of
Oakbrook) allowed a petition by the appellants for leave to appeal.
They appealed.

The facts are set out in the opinion of Lord Fraser of Tullybelton.

*Nicholas Phillips Q.C.* and *Christopher Symons* for the appellants.
*Michael Burton Q.C.* for the respondents.

11 February. Their Lordships allowed the appeal in respect of
documents and dismissed the appeal in respect of oral evidence,
intimating that their reasons would be given later.

28 February. LORD FRASER OF TULLYBELTON. My Lords, these
appeals raise two questions under section 2 of the Evidence (Procedure
in Other Jurisdictions) Act 1975. The questions relate to letters rogatory
issued out of the Superior Court of California for the City of San
Francisco requesting the assistance of the High Court in England, and to
orders made by the High Court in response to that request. One
question relates to orders for witnesses to attend before an examiner in
England for oral examination. The other relates to an order for
production of documents.

The respondents are four American corporations, or groups of
corporations, who manufacture asbestos. They are engaged in litigation
in the United States of America against insurers with whom they had a
large number of insurance policies to cover asbestos-related claims. Five
actions have been raised in the Superior Court of California in San
Francisco and they are collectively referred to as "the co-ordination
proceedings." The insurers named in the titles to the five actions are
merely a few of the many insurers involved and in each action certain
underwriters at Lloyd's of London are also parties. In four of the
actions, one or other of the respondents is the plaintiff and the
defendants are insurers or, in one case, American insurance brokers. In
the fifth action one of the insurers is the plaintiff and one of the
respondents is the defendant. But nothing turns on the forms of the
particular actions. The appellants are Sedgwick Group Plc., and two of
their subsidiary companies (collectively referred to as "Sedgwick"), who
together represent, as a result of amalgamations or otherwise, the final
brokers through whom all the relevant policies with Lloyd's underwriters
in London were arranged, and three individuals who are or were at the
material time directors of those brokers.

Each of the respondents is faced with claims from persons who say
that they are suffering from asbestos-related injuries, and who seek
compensation for these injuries and in some cases for damages to
property. In the co-ordination proceedings the respondents seek
declarations and damages and in some cases injunctive relief and
rectification against the insurers, including Lloyd's underwriters. There
are many thousands of claims and their total amount is very large. The
respondents allege that the insurers have failed or declined to defend
actions brought by the claimants for compensation, or to indemnify the
respondents against the claims.

Exhibit 3
Page 4 of 11

1 W.L.R.                    In re Asbestos Insurance (H.L.(E.))          Lord Fraser
                                                                        of Tullybelton

A    The issues in the co-ordination proceedings include the following:
(1) whether certain of the policies which are alleged to exist, dating back
as far as 1920, exist at all; (2) the extent of the cover actually placed by
the respondents with Sedgwick and in particular whether the insurance
cover extends only to claims based on asbestos-related disease which
manifested itself during the policy period or is provided only under
policies which relate to the period of inhalation or ingestion; (3) the
B    construction of certain of the policies issued by Lloyd's underwriters to
the respondents through the agency of Sedgwick, including the level of
loss at which liability of "excess" underwriters arises; and (4) whether
the respondents failed to disclose to the underwriters the extent of their
knowledge of the risk of asbestos-related injury.

    The orders now under appeal were made by McNeill J. on 25 July
C    1984. He ordered the three individual appellants to attend before
examiners to give oral testimony. As regards the production of
documents, he made an order against Sedgwick giving effect to all the
requests in the letters rogatory, except those in two paragraphs and
certain others which were not pursued by the pursuant respondents. The
Court of Appeal (Eveleigh, O'Connor and Slade L.JJ.) unanimously
dismissed the appeals by the three individual appellants against the
D    orders relating to oral testimony, and allowed in part Sedgwick's appeal
against the order relating to production of documents. Slade L.J. gave a
dissenting judgment in respect of the documents and would have allowed
Sedgwick's appeal in relation to all the documents in issue. The
appellants have now appealed by leave of this House.

    On 11 February 1985 the House allowed the appeal in respect of
E    documents and dismissed the appeal in respect of oral evidence. The
reasons for the decision were not stated on that day, owing to the
urgency of announcing the decision so that it could be carried into effect
before the trial began in California early in March. We intimated that
the reasons would be given later, and that we now do.

    The Act of 1975 was passed in order, inter alia, to give effect to the
principles of the Hague Convention on the Taking of Evidence abroad
F    in Civil or Commercial Matters (1977) (Cmnd. 6727) which was ratified
by the United Kingdom in 1976. The Act of 1975 was fully considered
by this House in *In re Westinghouse Electric Corporation Uranium
Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C.
547, where my noble and learned friend, Lord Wilberforce, said, at p.
612:

G        "I am of opinion that following the spirit of the Act which is to
        enable judicial assistance to be given to foreign courts, the letters
        rogatory ought to be given effect to so far as possible; . . ."

    I respectfully agree and I approach the present appeal with that
admonition in mind.

    Section 1 of the Act of 1975 (reading it short) provides:

H        "Where an application is made to the High Court . . . for an order
        for evidence to be obtained in [England], and the court is satisfied—
        (*a*) that the application is made in pursuance of a request issued by
        or on behalf of a court or tribunal ('the requesting court') exercising
        jurisdiction . . . in a country or territory outside the United
        Kingdom; and (*b*) that the evidence to which the application relates
        is to be obtained for the purposes of civil proceedings which either
        have been instituted before the requesting court or whose institution

Exhibit 3
Page 5 of 11

before that court is contemplated, the High Court . . . shall have    A
the powers conferred on it by the following provisions of this Act."

Section 2(1) provides that the High Court shall have power by order
to make such provision for obtaining evidence in England as may appear
to the court to be appropriate for the purpose of giving effect to the
request in pursuance of which an application has been made under
section 1.  Subsection (2) of section 2, so far as relevant, provides that    B
an order under the section may make provision: "(a) for the examination
of witnesses, either orally or in writing; (b) for the production of
documents; . . ." Subsection (3) is not material in the present appeal.
Subsection (4) is the subsection which is directly in point here and I
must quote it in full as follows:

"An order under this section shall not require a person—(a) to state    C
what documents relevant to the proceedings to which the application
for the order relates are or have been in his possession, custody or
power; or (b) to produce any documents other than particular
documents specified in the order as being documents appearing to
the court making the order to be, or to be likely to be, in his
possession, custody or power."    D

Two preliminary observations fall to be made on subsection (4). It
was evidently passed in order to give effect to the United Kingdom
Government's reservation, made in accordance with article 23 of the
Convention when it ratified the Convention, declaring that: "the United
Kingdom will not execute letters of request issued for the purpose of
obtaining pre-trial discovery of documents." While that is the explanation    E
for the presence of subsection (4) in the Act, I do not consider that it
assists directly in the construction of the subsection so far as this appeal
is concerned. The wide-ranging nature of pre-trial discovery in the
United States of America was explained by Lord Wilberforce in
Westinghouse, but there is no question of the letters of request which
are before the House in this appeal having been issued for the purpose    F
of obtaining pre-trial discovery. The time for such discovery is long past,
and the trial is due to begin in California about one month after the
date on which we heard the appeal. Secondly, Mr. Phillips drew our
attention to what appears to be a drafting error in paragraph (b) of
subsection (4). Paragraph (b) refers to "particular documents specified in
the order as being documents appearing to the court," etc. (emphasis
added). The effect of the word "as," read literally, would be to require    G
that the order itself most specify that the documents appear to the court,
etc. But that is, apparently, not the usual practice, and the order against
Sedgwick does not so specify. Mr. Phillips did not take any objection to
the order on that ground and I think he was wise not to do so.

*Production of documents*    H

It will be convenient to consider first Sedgwick's appeal against the
order for production of documents. This appeal is limited to the order
so far as it gives effect to paragraphs (b) and (g) and the first part of
paragraph (j) of the letters of request. (McNeill J. had already refused
the request for documents under the second part of paragraph (j).)
These paragraphs are in the following terms:

Exhibit 3
Page 6 of 11

A      "(b) The written instructions from the plaintiffs or their agents to
Sedgwick to obtain the insurance policies set forth in exhibit 1
hereto.
     "(g) The written instructions to Sedgwick from the plaintiffs or their
agents to obtain the insurance policies referred to in (f) above.
     "(j) The exemplars of Price, Forbes & Co. Ltd.'s excess comprehen-
sive personal injury and property damage 'umbrella' liability policies
B      in use in the London insurance market during the period 1950
through 1966; . . ."

    Paragraphs (b) and (g) raise exactly the same point and can be
considered together. Exhibit 1 referred to in paragraph (b) is a list of
policies identified by their numbers and by the numbers of brokers'
slips. Paragraph (g) refers back to paragraph (f) which in turn refers to
C  exhibit 4 where the dates during which predecessors of certain of the
respondents are said to have effected policies are stated. The question is
whether paragraphs (b) and (g) of the letters specify "particular
documents" and thus comply with section 2(4)(b) of the Act of 1975.
McNeill J. held that they did so. The majority of the Court of Appeal
upheld that view, but Slade L.J. dissented, holding that they did not
D  particularise the documents.
    The meaning of the expression "particular documents specified in the
order" in subsection (4)(b) was considered by several of the noble and
learned lords who took part in the *Westinghouse* case [1978] A.C. 547
decision. They were all emphatic that the expression should be given a
strict construction. Having regard to the purpose of subsection (4)
E  which, as I have already mentioned, is to preclude pre-trial discovery, it
is to be construed so as not to permit mere "fishing" expeditions. Lord
Wilberforce said, at p. 609:

     "These provisions, and especially the words 'particular documents
specified in the order' (replacing 'documents to be mentioned in the
order' in the [Foreign Tribunals Evidence Act] 1856) together with
the expressed duty of the English court to decide that the documents
F      are or are likely to be in the possession, custody or power of the
person called upon to produce, show, in my opinion, that a strict
attitude is to be taken by English courts in giving effect to foreign
requests for the production of documents by non-party witnesses.
They are, in the words of Lord Goddard C.J., not to countenance
'fishing' expeditions: *Radio Corporation of America v. Rauland
Corporation* [1956] 1 Q.B. 618, 649."
G

    Lord Diplock expressed perhaps an even more restrictive view of the
effect of subsection (4)(b) where he said, at p. 635:

     "The requirements of subsection (4)(b), however, are not in my
view satisfied by the specification of classes of documents. What is
called for is the specification of 'particular documents' which I
H      would construe as meaning individual documents separately
described."

    I do not think that by the words "separately described" Lord Diplock
intended to rule out a compendious description of several documents
provided that the exact document in each case is clearly indicated. If I
may borrow (and slightly amplify) the apt illustration given by Slade
L.J. in the present case, an order for production of the respondents'

Exhibit 3
Page 7 of 11

Lord Fraser
of Tullybelton                    In re Asbestos Insurance (H.L.(E.))                    [1985]

"monthly bank statements for the year 1984 relating to his current    A
account" with a named bank would satisfy the requirements of the
paragraph, provided that the evidence showed that regular monthly
statements had been sent to the respondent during the year and were
likely to be still in his possession. But a general request for "all the
respondent's bank statements for 1984" would in my view refer to a
class of documents and would not be admissible.

The second test of particular documents is that they must be actual    B
documents, about which there is evidence which has satisfied the judge
that they exist, or at least that they did exist, and that they are likely to
be in the respondent's possession. Actual documents are to be contrasted
with conjectural documents, which may or may not exist. In the
*Westinghouse* case, I said, at p. 644:

"The reference to 'any' documents in the sweeping-up words in the    C
schedule to the letters rogatory suggests to me that the draftsmen
did not know whether such documents were in existence or not.
Accordingly the words seem to be an attempt to circumvent
paragraph (*a*) of section 2(4) of the Act of 1975, an attempt which
should not be allowed to succeed."

In my opinion the terms of paragraphs (b) and (g) of the letters    D
rogatory in the present case fail both these tests. They fail the second
test because there was no evidence that there was usually a single
document or set of documents by which written instructions for policies
from the plaintiffs or their agents were transmitted to Sedgwick. The
only document to which our attention was called as being a specimen of
such an instruction related to the renewal of a policy and it is certainly
not a definite instruction. It is addressed to one of the firms now    E
represented by Sedgwick and it includes the following paragraph:

"We would ask you specifically to remove from the renewal [a
particular provision] as this is not in keeping with the umbrella form
as now written. We look forward to hearing from you on this
subject by cable as soon as possible, after the receipt of this
memorandum."                                                        F

That appears to be a request or inquiry which might well have led to
correspondence and discussion about the terms of the final policy.
Moreover, for all that appears from the evidence, it is possible that
instruction for some policies may have been given verbally and that
there were no written instructions for those policies. In an affidavit
sworn by the attorney for one of the respondents, he states his belief    G
that:

"it is necessarily the case that Sedgwick must have received
instructions [n.b. not 'written instructions'] to proceed as it did and
*on this basis* have reason to believe that Sedgwick possesses the
documents . . . referred to in [paragraph (*b*) of the letters rogatory]."
(Emphasis added.)                                                   H

In the light of the evidence as a whole paragraphs (b) and (g) are in
effect calls for production of "written instructions *if any*," that is to say,
for conjectural documents which may or may not exist. In the
*Westinghouse* case, at p. 611, Lord Wilberforce was willing to extend
"particular documents specified" to include replies to letters "where
replies must have been sent." I would go that far with him, but I would
not extend the expression to documents which may or may not exist.

Exhibit 3
Page 8 of 11

1 W.L.R.                 In re Asbestos Insurance (H.L.(E.))        Lord Fraser
                                                                 of Tullybelton

A    For much the same reasons I am of opinion that these paragraphs of
the letters rogatory also fail the first test in respect that they do not refer
to particular documents at all. In effect they refer to "all or any
documents falling within the class consisting of written instructions." The
class is ill defined and in my view there is room for some doubt whether
the specimen document that I have mentioned relating to renewal of a
policy falls within the class or not. I would therefore hold that paragraphs
B    (b) and (g) should not be made the subjects of the order for production
of documents.

With regard to paragraph (j) the word "exemplars" is not one that is
in common use and its meaning is not altogether clear to me. For the
present purpose the evidence shows that "exemplars" is used to describe
the standard forms of what were called "umbrella" policies which were
C    developed by Sedgwick in conjunction with others, and which varied
from time to time. The first part of paragraph (j) gives no indication of
the dates on which the exemplars were amended or different exemplars
came into use, and its effect is to call for all exemplars of umbrella
policies that were in use at any time during the period from 1950 to the
end of 1966. That is in my opinion clearly a description of a class of
documents and not of particular documents. Moreover, the class is not
D    clearly defined by the opening words of paragraph (j) which refer to
"exemplars of Price, Forbes & Co. Ltd.'s . . . 'umbrella' . . . policies."
There is nothing to show how their policies are to be distinguished from
policies of other firms; the distinction might be important having regard
to evidence that they "and . . . other Sedgwick companies" were
responsible, "in conjunction with one or more North American brokers,
E    for developing, drafting and marketing these umbrella policies." This
paragraph therefore fails the first test.

*Oral testimony*

The appeals of the three individual appellants against orders to give
oral evidence were presented on the basis that the Californian judge
who issued the letters rogatory had been misled into over-estimating the
F    evidence that these appellants could give. For example, it is said that
Mr. Crane, whose experience of insurance is limited to dealing with
claims, has been asked to give evidence about placement of risks,
underwriting, drafting and interpretation of policies and other matters of
which he has no direct knowledge. I am not impressed by this argument.
Each of these three appellants admits that he is in a position to give
G    some evidence that is relevant to the co-ordination proceedings. It may
be that they will be asked for evidence about matters which are outwith
their experience, and which they are not qualified to deal with. If so,
they can say so. It would be quite inappropriate, even if it were
possible, for this House or any English court to determine in advance
the matters relevant to the issues before the Californian courts on which
H    each of these witnesses is in a position to give evidence. As my noble
and learned friend, Lord Keith of Kinkel, said in the *Westinghouse* case
[1978] A.C. 547, 654:

"In the face of a statement of letters rogatory that a certain person
is a necessary witness for the applicant, I am of opinion that the
court of request should not be astute to examine the issues in the
action and the circumstances of the case with excessive particularity
for the purpose of determining in advance whether the evidence of

Exhibit 3
Page 9 of 11

that person will be relevant and admissible. That is essentially a    A
matter for the requesting court."

Mr. Phillips appreciated the difficulty in the way of this House if it tried
to determine the matters on which oral evidence would be relevant and
admissible in the Californian proceedings, and, in order to meet the
difficulty, he suggested that the letters rogatory should be sent back to
the Californian court to be reconsidered by the judge there with a view    B
to their being amended and restricted. I am not in favour of that course.
It would cause delay, which is an important matter as the trial in
California is due to begin early in March 1985. Quite apart from the
delay, the Californian judge might not be persuaded to restrict the scope
of the letters rogatory to the extent that would satisfy the appellants, or
at all, and there would be no satisfactory way of resolving any difference
between his view and the views of the English court. I would refuse the    C
appeals against the orders relating to oral evidence.

### Costs

The appellants at first contended that no orders at all should be
made in response to the letters rogatory, and it was therefore necessary    D
for the respondents to bring the matter before McNeill J. The
respondents should therefore have their costs up to the end of the
proceedings before McNeill J. So far as the costs to the Court of
Appeal and this House are concerned, success has been divided and no
order for costs either in the Court of Appeal or in this House should be
made.
E

LORD WILBERFORCE.
My Lords, I have had the benefit of reading in advance the text of
the speech delivered by my noble and learned friend, Lord Fraser of
Tullybelton. In concurrence with him I find myself in agreement with
the judgment of Slade L.J. in the Court of Appeal. I agree with the
disposal of the appeals suggested by my noble and learned friend.    F

LORD KEITH OF KINKEL.
My Lords, I agree that, for the reasons set out in the speech of my
noble and learned friend, Lord Fraser of Tullybelton, the appeal relating
to documents should be allowed and that relating to oral evidence
dismissed.
G

LORD ROSKILL.
My Lords, I have had the advantage of reading in draft the speech
delivered by my noble and learned friend, Lord Fraser of Tullybelton. I
agree with it, and for the reasons which he gives I would allow the
appeal relating to documents and dismiss the appeal relating to oral    H
evidence.

LORD BRIDGE OF HARWICH.
My Lords, I have had the advantage of reading the speech of my
noble and learned friend Lord Fraser of Tullybelton explaining the
reasons for the order of the House made on 11 February last that the
appeal in respect of documents be allowed and the appeal in respect of

Exhibit 3
Page 10 of 11

341

1 W.L.R.                        In re Asbestos Insurance (H.L.(E.))                    Lord Bridge
                                                                                      of Harwich

A  oral evidence be dismissed. I agree with it. I also agree with his
proposals with respect to costs.

*Appeal of Sedgwick allowed.*
*Order of Court of Appeal varied so*
*as to include items (b), (g) and (j)*
*of letters rogatory.*

B  *Appeals of individual appellants dis-*
*missed.*
*New date for examination to be set.*
*Respondents to have costs up to end*
*of proceedings before McNeill J.*
*No order for costs in Court of Appeal*

C  *or House of Lords.*

*Solicitors: Herbert Smith & Co.; Coward Chance.*

M. G.

D

—————

E

F

G

H

Exhibit 3
Page 11 of 11