IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FEREYDUN TABAIAN and AHMAD          No. 3:18-cv-00326-HZ
ASHRAFZADEH,

          Plaintiffs,

   v.

INTEL CORPORATION,                      OPINION

          Defendant.

Jeffrey S. Love
John D. Vandenburg
Mark W. Wilson
KLARQUIST SPARKMAN, LLP
One World Trade Center
121 S.W. Salmon Street, Suite 1600
Portland, Oregon 97204

Howard L. Close
Kathleen S. Rose
Patrick B. McAndrew
Ronald L. Flack, Jr.
WRIGHT CLOSE & BARGER, LLP
One Riverway, Suite 2200
Houston, Texas 77056

     Attorneys for Plaintiffs

Renée E. Rothauge
MARKOWITZ HERBOLD PC
1211 S.W. Fifth Avenue, Suite 3000
Portland, Oregon 97203-3730

Michael J. Summersgill
Jordan L. Hirsch
WILMER CUTLER PICKERING HALE and DORR LLP
60 State Street
Boston, Massachusetts 02109

Todd C. Zubler
WILMER CUTLER PICKERING HALE and DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Attorneys for Defendant

HERNANDEZ, District Judge:

Plaintiffs Fereydun Tabaian and Ahmad Ashrafzadeh are the inventors and owners of

United States Patent No. 7,027,944 Patent ("the '944 Patent") which is titled "'Programmable

Calibration Circuit and Power Supply Current Sensing and Droop Loss Compensation," and

which issued on April 11, 2006. Compl. ¶¶ 1, 7, 8, ECF 1. The '944 Patent discloses a circuit for

using calibration for precise voltage regulation. *Id.* ¶ 2. "The invention described in the patent

provides circuits and methods for addressing voltage regulator current sensing variations, voltage

droop, manufacturing variations, temperature dependencies, and mismatched phase outputs in a

multiphase power regulator." *Id.* "The invention advantageously provides circuits and methods

to properly power a computer processor or integrated circuit chip according to the unique power

specifications of the processor or chip." *Id.*

In their Complaint, Plaintiffs allege that Defendant developed its Fully Integrated Voltage

Regulator (FIVR) technology with "full knowledge" of the '944 Patent invention, using the

invention as one of FIVR's key components. *Id.* ¶ 4. Plaintiffs allege that the FIVR components of several processors made by Defendant infringe the '944 Patent. *Id.* ¶¶ 4, 5.

On July 24, 2018, Defendant moved to disqualify Plaintiffs' expert Mike Walters. After completion of the motion briefing, I held a telephone oral argument on the motion on August 15, 2018. At the conclusion of that hearing, I granted the motion. *See* ECF 75 (Minutes of Aug. 15, 2018 motion hearing). This Opinion explains my reasoning.

According to Jorge Rodriguez, a senior engineer employed by Defendant, Defendant manufactures microprocessors which are semiconductor integrated circuits for use in computers. Rodriguez Decl. ¶ 5, ECF 61. A microprocessor requires one or more voltage regulators in order to "convert the voltage from its power supply (such as an electrical outlet or battery) to a voltage that is useable by the microprocessor and that provides the electrical power required by the microprocessor in an efficient manner." *Id.* Starting in the late 1990s, Defendant developed the Intel Mobile Voltage Positioning (IMVP) technology which was "designed to create voltage regulators that reduce the amount of consumed power while providing greater processor performance." *Id.* ¶ 6. For nearly twenty years, Defendant has worked with third-party semiconductor suppliers to develop voltage regulators that work with Defendant's microprocessors. *Id.* Defendant's current voltage regulator technology, the FIVR that is at issue in the patent infringement claim, is, according to Rodriguez, an "outgrowth" of Defendant's prior IMVP work. *Id.* ¶ 19. Before 2013, Defendant's microprocessors typically required multiple IMVP voltage regulators, with each providing a specific voltage to a different part of the microprocessor such as its core or graphics unit. *Id.* But, starting in 2013, the FIVR technology "integrated the functionality of multiple IMVP regulators onto the microprocessor die, which

Defendant manufactures." *Id.* Defendant's microprocessors with FIVR require only one external IMVP voltage regulator because the others have been integrated onto the die. *Id.* Therefore, according to Rodriguez, Defendant's FIVR technology performs many functions that voltage regulators previously provided by third-party suppliers performed, and FIVR "displaces these suppliers' products to a significant degree." *Id.*

From 1999 to 2009, Walters worked for two third-party supplier companies, Intersil Corporation and International Rectifier Corporation, to "develop power specifications" and define voltage regulators for use with Defendant's microprocessors. Jaikumar July 24, 2018 Decl., Ex. 4, ECF 62-4 (Walters's resume showing work at Intersil from 1999-2003 as a "Power System Architect" which included work with "industry leaders" including Defendant to develop power specifications; showing work at International Rectifier Corp from 2003-09 as a "Portable Applications Manager"); *id.*, Ex. 5, ECF 62-5 (July 6, 2018 email from Plaintiffs' counsel to Defendant's counsel explaining that Walters's role at both Intersil and International Rectifier "was to define integrated circuits (voltage regulation control) that their customers used to power server, desktop, and laptop computers using Intel processors"; noting that Walters worked with engineers in Defendant's vendor enabling groups from 1999 through 2009 and his principal contacts there were Jon Day for desktop/server products and Jorge Rodriguez for laptop products). Both corporations had non-disclosure agreements (NDAs) with Defendant, protecting as confidential information provided by Defendant to those companies. Jaikumar July 24, 2018 Decl., Exs. 1, 2, 3, ECF 62-1, 62-2, 62-3.

According to Rodriguez, over the last twenty years, Defendant has released multiple IMVP specifications, classified as "Intel Restricted Secret" documents which can be viewed by

non-Intel parties only under the protection of an NDA.  Rodriguez Decl. ¶ 7.  Rodriguez states

that the IMVP specifications released in those documents identify, in detail, information about

Intel microprocessors and the technical requirements for voltage regulators that can work with

Intel microprocessors.  *Id.*  As Rodriguez describes, Defendant provides these specifications to

suppliers under NDAs and then works with the suppliers to develop voltage regulators that the

suppliers will manufacture.  *Id. ¶ 8.*

Rodriguez states that Defendant provided Walters with many confidential IMVP-related

documents during the years he worked in a confidential relationship with Defendant.  *Id.* ¶ 10.

All of the documents were provided under an NDA and pursuant to a specific "Confidential

Information Transmittal Record for Restricted Secret Information" (CITR) that Walters was

asked to sign.  *Id.*  Rodriguez states that during his years of work with Defendant, Walters

received significant quantities of confidential information about Intel voltage regulator

technology. *Id.* ¶ 11.  According to Rodriguez, as a power supply architect at Intersil, Walters

needed access to Defendant's IMVP specifications which are Intel Restricted Secret material, and

Walters received copies of such documents.  *Id.*  These documents described Defendant's

confidential designs for many aspects of voltage regulators, including how voltage was regulated,

how current was regulated, the role of a reference voltage, and the use of temperature.  *Id.*

Attached to Rodriguez's Declaration are copies of email correspondence from Rodriguez to

Walters in which Rodriguez personally sent Defendant's confidential information to Walters.  *Id.*

¶ 12 & Exs. 1, 2, 3, 4, 5; *see also id.* ¶¶ 13-18 (describing date and content of communications

and documents).

Based on Walters's prior employment by the two third-party supplier companies, his work

on voltage regulators for use in Defendant's microprocessors, and the undisputed receipt by Walters of confidential documents subject to an NDA, Defendant argues that Walters should be disqualified from acting as a consultant or expert for Plaintiffs in this litigation. In response, Plaintiffs do not dispute Walters's prior employment but they contend that the work he performed and the information he had access to is not directly related to the technology at issue in this case. Moreover, Plaintiffs argue that Walters will review these documents in discovery anyway, creating little potential for him to rely on documents he viewed outside of litigation to form his opinions. The parties also dispute who will be most harmed if Walters is excluded.

Relevant cases indicate that disqualification motions are analyzed under a three-part test: (1) was there a confidential relationship between the party and the expert; (2) is the information disclosed by the party to the expert relevant to the current litigation; and (3) what is the relative prejudice to the parties and the impact of disqualification on the integrity of the legal process. *See Oracle Corp. v. DrugLogic, Inc.*, No. C-11-00910-JCS, 2012 WL 2244305, at *5-6 (N.D. Cal. June 15, 2012); *Broadcom Corp. v. Emulex Corp.*, No. SACV 09-01058-JVS (ANx), 2010 WL 11465478, at *1 (C.D. Cal. Apr. 5, 2010).

I. Confidential Relationship

Walters was subject to formal NDA agreements that both of his employers had with Defendant during the 1999-2009 period. Defendant also sent CITR forms identifying specific confidential information Defendant made available to Walters which Walters signed and returned to Defendant. Plaintiffs admit that through his work with Intersil and International Rectifier, Walters was privy to Intel technical specifications under various NDAs entered into by his former employers and he was provided with Intel voltage regulator specifications and IMVP

specifications that would inform third-party vendors how their products needed to perform to function properly with Intel products. Pls.' Resp. 4, ECF 63 (also stating that his work with these specifications amounted to less than ten-percent of his work for those companies).

Plaintiffs suggest that because Walters was not employed by Defendant and never directly worked as a consultant to Defendant, he was not in a confidential relationship with Defendant. *Id.* at 1, 8-9. Plaintiffs cite to three cases in support of this position, each of which involved an expert working directly with the objecting party or that party's predecessor-in-interest. *Id.* at 8-9 (citing *Auto-Kaps, LLC v. Clorox Co.*, No. 15 Civ. 1737 (BMC), 2016 WL 1122037, at *3 (E.D.N.Y. Mar. 22, 2016) (plaintiff's expert had consulted directly with the defendant on relevant technology); *Oracle*, 2012 WL 2244305, at *6 (defendant's expert had consulting relationship with plaintiff's predecessor-in-interest regarding technology at issue); *Broadcom*, 2010 WL 11465478, at *2 (defendant's expert was named inventor of patent at issue, was vice-president of engineering for plaintiff's predecessor-in-interest)).

While it is true that these cases did not involve an expert who was employed by a third-party supplier instead of one employed directly by the objecting party or that party's predecessor-in-interest, it is also true that none of these cases affirmatively address the situation here. Thus, none of the cases actually discuss Plaintiffs' implicit contention that a confidential relationship exists only when the challenged expert has worked directly for the objecting party or its predecessor-in-interest. I do not find support for such a narrow view in the cases. As the *Broadcom* court explained, the "primary reason courts look for a confidential relationship is to determine whether it was reasonable to divulge confidential information to the party to be disqualified." *Broadcom*, 2010 WL 11465478, at *2. Thus, that court explained, the focus is on

the reasonableness of the confidential disclosure at the time it was made. *Id.* It is "irrelevant that the subsequent successor-in-interest never directly employed the party." *Id.* Similarly, in a 2013 Kansas case, the district court observed that in considering the existence of a confidential relationship, the court must determine whether the relationship was one in which "it would be reasonably expected that any communication between [the objecting party and the expert] would be maintained in confidence by the expert." *Sarl v. Sprint Nextel Corp.*, No. 09-2269-CM/DJW, 2013 WL 501783, at *4 (D. Kan. Feb. 8, 2013). In that case, the court held that a confidential relationship existed between the plaintiff and the defendant's expert who was not a former employee of the plaintiff's and was neither a former expert nor consultant for the plaintiff but who had received confidential information from the plaintiff while employed by a company previously "affiliated" with the plaintiff. *Id.* at *5.

Here, it was reasonable for Defendant to disclose confidential information to Walters's employers during the course of Defendant's relationship with those companies. Given the reasonableness of the confidential disclosures at the time and that Walters was bound by the confidentiality restrictions pertaining to those disclosures as an employee of those third-party suppliers, it is irrelevant that Walters was never employed directly by Defendant or had a consulting relationship directly with Defendant. Defendant has established that a confidential relationship existed between it and Walters.

II. Relevant to the Litigation

Plaintiffs argue that Defendant fails to establish that the information Walters received is relevant to this litigation because (1) the information obtained by Walters was remote in time; (2) the information will be produced in discovery; and (3) the technical information described by

Rodriguez as having been provided to Walters is not related to the '944 Patent and the claims of infringement. I do not separately discuss the first argument. The fact that Walters received confidential information ten to twenty years ago is not enough by itself to conclude that the information is irrelevant to the litigation in the face of Defendant's assertion that the FIVR technology at issue in this case grew out of the technology that was the subject of confidential information received by Walters. The proper focus is on the second and third arguments.

A. Production in Discovery

Plaintiffs note that Defendant does not contend that the confidential information it previously produced to Walters is unobtainable through discovery. As a result, they argue that Defendant cannot prevail on this motion. In support, they cite to cases which state that confidential communications regarding technical information as opposed to privileged information such as that protected by attorney work product or attorney-client privilege, will not support a disqualification motion. I find the cases distinguishable or not persuasive.

In *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087 (N.D. Cal. 2004), the court considered the defendant's motion to disqualify the plaintiff's expert who had previously been retained by the defendant in another case in a different district court but which involved the same patent. *Id.* at 1089-92. The only confidential information at issue was what the defendant's lawyer had discussed with the expert during the pendency of that other case including viability of the patent and questions of invalidity. The expert had not been previously employed by the defendant or consulted for the defendant in regard to substantive technical information. Thus, the *Hewlett-Packard* court had no reason to discuss whether an expert who received confidential technical information outside of the litigation context had received confidential information of

the type capable of supporting disqualification. Accordingly, the nature of the dispute before the court necessarily informed the legal precepts it cited regarding "confidential information." It was in that context that the court stated that "[c]onfidential information essentially is information of either particular significance or that which can be readily identified as either attorney work product or within the scope of attorney-client privilege." *Id.* at 1094 (internal quotation marks and brackets omitted) (further noting that such information could include discussion of the party's litigation strategy, the types of experts the party expected to retain, opinions of the strengths and weaknesses of each side, etc.). In the end, the court held that the defendant failed to establish that the plaintiff's expert had received confidential information from the defendant's prior counsel because the record showed that the expert's retention by that counsel consisted of a few short telephone conferences, a single one-hour telephone conference, and limited discussion without specifics of litigation strategy. *Id.* at 1097. The facts of *Hewlett-Packard* are distinguishable and as a result, the legal standards cited and discussed are inapplicable here.

Other cases cited by Plaintiffs are unpersuasive. In *Nikkal Industries, Ltd. v. Salton, Inc.*, the entirety of the court's discussion of the disqualification motion was grounded in the concept of "privilege." 689 F. Supp. 187 (S.D. N.Y. 1988). There, the court initially cited to Federal Rule of Civil Procedure 26's provision that discovery may be obtained regarding "'any matter, not *privileged*, which is relevant to the subject matter involved in the pending action[.]'" *Id.* at 191 (quoting Fed. R. Civ. P. 26(b)) (emphasis in *Nikkal*). The court then discussed that the party claiming a privilege has the burden of establishing its existence and its non-waiver. *Id.* The court stated that it would look to "Supreme Court admonitions on the issue of privilege" for guidance. *Id.* (noting, *e.g.*, that courts do not look upon testimonial privileges with favor).

Finally, the court concluded that the meeting between the defendant's expert and an attorney for the plaintiff was nothing more than an "employment style interview," which included providing technical information. Because, in the court's opinion, "[c]ommunication based upon technical information as opposed to legal advice is not considered privileged[,]" the court concluded that the plaintiff had failed to show that the communication was privileged. *Id.* at 191-92. The *Nikkal* case did not discuss "confidential information" as opposed to "privilege." As a result, the case suggests that when an expert has received information recognized in the discovery context as privileged, disqualification may be warranted if the expert and the provider of the information had a confidential relationship. Because the court focused on the concept of "privileged" information in the sense that a party may withhold the production of such information in discovery, the court took an unnecessarily narrow view of the various contexts in which confidential, non-privileged, information may be considered.

In contrast, other cases, as explained in *Sarl*, some of which Defendant cites here, "have disqualified experts who have received confidential technical information wholly unrelated to issues of privileges." *Sarl*, 2013 WL 501783, at *6. *Sarl* discussed the two conflicting lines of cases: (1) those allowing disqualification of experts "who gained technical confidential information concerning the patent or technology at issue in the litigation[,]" and (2) those that limit disqualification to situations where the expert has received "privileged confidential communications or documents pertaining to litigation, which may reflect information subject to the work-product doctrine or attorney client privilege." *Id.* at *6-7. The *Sarl* court agreed with the latter line of cases, noting the distinction "between confidential information that relates to purely technical or business information that is discoverable in litigation, and information that

relates to confidential communications concerning legal strategies or other litigation-related issues that is privileged and not otherwise subject to discovery." *Id.* at *7; *see also id.* at *6 (noting the plaintiff's argument that a "party's confidential business or technical information is subject to discovery in the ordinary course of litigation" and that it "makes no difference, as a practical matter, whether the expert became aware of that information via discovery taken in the litigation or some other independent route" and distinguishing the "unfair advantage" that could be obtained if the expert were exposed to a party's litigation strategies, analysis of strengths or weaknesses of the case, or other "similar privileged or litigation-related confidential information").

What *Nikkal*, *Sarl*, and the cases *Sarl* followed fail to appreciate, however, is that an expert who has received confidential technical information is likely to be unable to segregate information obtained in the context of the confidential relationship, and opinions based on that information, from information produced in discovery. For example, the *Auto-Kaps* court recognized the "danger [] that no one may know how the information [the expert] learned from Clorox may affect his opinion and [that the expert] may inadvertently use confidential information." *Auto-Kaps*, 2016 WL 1122037, at *4 (internal quotation marks omitted) (granting motion to disqualify expert who had provided consulting services for defendant involving the technology at issue in the litigation); *see also Pellerin v. Honeywell Int'l Inc.*, No. 11cv1278-BEN (CAB), 2012 WL 112539, at *3 (S.D. Cal. Jan. 12, 2012) (disqualifying expert because it was unrealistic to believe that former employee could parse knowledge of confidential information and rely only on information provided in litigation); *Eastman Kodak Co. v. Agfa-Gevaert N.V.*, No. 02-CV-6564, 2003 WL 23101783, at *5 (W.D.N.Y. Dec. 4, 2003)

(excluding expert who had "access to, knowledge of and training in many of the 'building blocks' that produced Kodak's 'T–Grain patent'" and explaining that "[t]o expect [the expert] to somehow suppress that knowledge by not revealing confidential information encompassed by his employment agreement with Kodak when he has been retained by Agfa to evaluate the validity of patents pertaining to the specific technology he spent over a decade studying for Kodak is unworkable if not quixotic.").

In the instant case, Defendant asserts that in addition to documents, Walters had conversations and participated in meetings with Defendant's engineers when confidential design information was discussed. *See* Rodriguez Decl. ¶¶ 15, 16 (describing presentations for meetings); ¶ 17 (describing minutes of a meeting attended by Walters). This undermines the principles upon which *Sarl* and similar cases relied because Walters received confidential information that he will not receive in the regular course of discovery in this case. But, as *Auto-Kaps* recognized, even if all the confidential information Walters received from Defendant is discoverable, it is still impossible to know how the information he received in the context of his confidential relationship has informed his opinions on IMVP technology. I am persuaded by the cases recognizing that disqualification of an expert may be based on the expert's receipt of technical information and not just "privileged" communications such as attorney-client or attorney work product. Thus, the fact that the information may be obtained in discovery is not a basis for denying the motion.

B. Relationship of Confidential Information to Litigation

As indicated above, Rodriguez states that Defendant's current FIVR voltage regulator technology is an "outgrowth" of Defendant's prior IMVP work. Rodriguez Decl. ¶ 19. He

explains, as described above, that before 2013, Defendant's microprocessors required multiple IMVP voltage regulators but since that time, the FIVR technology integrated the functionality of the multiple IMVP voltage regulators onto the microprocessor die, manufactured by Defendant. *Id.* As a result, FIVR microprocessors require only one external IMVP voltage regular because the functions previously performed by the multiple IMVP regulators have been integrated onto the die. *Id.*

Plaintiffs object to these assertions by Rodriguez, arguing that Rodriguez's claim that FIVR is derived from the IMVP technology lacks support and that Rodriguez fails to state the nature of his involvement in the development of FIVR. Pls.' Resp. 12 (further arguing there is no foundation for the assertions in Paragraph 19 of Rodriguez's Declaration). I reject this argument. Rodriguez has worked for Defendant for twenty-three years. Rodriguez Decl. ¶ 1. He is currently a Senior Engineer who works in the Datacenter Power Solutions group and is responsible for engineering power solutions for server computers. *Id.* ¶ 3. Previously, he was a Senior Engineer responsible for Defendant's Mobile Power Delivery Platform and Hardware Development. *Id.* ¶ 4. In that position, he "worked on voltage regulators for client computers (e.g., PCs), and specifically, for mobile computers (laptop PCs)." *Id.* His declaration is sworn under penalty of perjury. Rodriguez Decl. at p. 6 (declaring under penalty of perjury under the laws of the United States that the foregoing assertions in the Declaration are true). Rodriguez's work experience for more than twenty years as a Senior Engineer with power supply groups provides a sufficient foundation for his assertions regarding the development of Defendant's power supply technology.

The Complaint clearly implicates Defendant's FIVR voltage regulators as a basis for the

infringement allegations. *E.g.*, Compl. ¶¶ 39-49 (allegations regarding infringement of Claim 1 of the '944 Patent based on the use of voltage identification codes (VIDs) in the FIVR voltage regulators). And, based on Rodriguez's statements, FIVR is derived from the prior IMVP technology and voltage regulators. Defendant argues that the confidential information Walters received about IMVP is relevant to this litigation in three ways: (1) he received confidential information concerning the same type of Intel voltage regulation functionalities that Plaintiffs now accuse Defendant of infringing; (2) information Walters received is relevant to show Defendant's independent development of its voltage regulator technology which rebuts Plaintiffs' assertion that Defendant took some of its voltage regulation functionality from Plaintiffs; and (3) the IMVP information received by Walters is relevant prior art to the '944 Patent and thus is relevant to the invalidity of the '944 Patent.

Plaintiffs contend that Walters received only technical *specifications* regarding the IMVP voltage regulators which, according to Plaintiffs, is distinct from *technology* or design information. Pls.' Resp. 11 (stating that Walters received "specifications that products of outside vendors would need to meet in order to function alongside Intel products in computers produced by other companies more than a decade ago" and arguing that Defendant "wrongly uses 'technology' as an umbrella term[] to capture technical information that has no bearing on this suit"). Walters asserts that he did not receive design information for voltage regulators or information on how to implement a voltage regulator. Walters Decl. ¶ 6, ECF 63-2; *see also id.* (stating that Defendant's IMVP specifications did not describe Defendant's confidential design of voltage regulators, but instead, contained only the voltage regular specifications); *id.* ¶ 8 (information received was specifications that the products of outside inventors needed to meet so

their products would function alongside Defendant's products in a computer); *id.* (information labeled as Defendant's technology did not disclose microprocessor design or inner workings but conveyed the desired response of the regulator to the given command).

The dispute centers on whether information received by Walters during his ten-year confidential relationship with Defendant relates to the FIVR technology at issue in this litigation, and specifically, whether he received confidential information regarding voltage regulators including how voltage was to be regulated, how current was to be regulated, use of temperature, and specifications and technical requirements supporting the voltage regulators' ability to work with Defendant's microprocessors. Through Rodriguez's Declaration, Defendant points to several examples of information received by Walters which Defendant contends support its position. Plaintiffs rely on Walters's Declaration to contend that the information is not relevant to the technology at issue in this case.

First, Rodriguez cites to an August 15, 2003 email sent to Walters and others regarding an updated pre-release version of the specification for the IMVP-IV, which Rodriguez explains is the fourth iteration of Defendant's IMVP technology. Rodriguez Decl. ¶ 13. Rodriguez asserts that the IMVP-IV specification contains detailed design guidelines and electrical and timing requirements for voltage regulators required to work with Defendant's microprocessors. *Id.* The email and its seventy-nine page attachment is Exhibit 1 to Rodriguez's Declaration. The introductory page of the document confirms that the document defined the "DC-DC Voltage Regulator electrical requirements" for certain mobile processors used in certain platforms and that the document contained "collateral" defining the Power Status Indicator signal. Rodriguez Decl., Ex. 1 at 10 (89900DOC00051124). Later, the electrical and timing requirements are

spelled out. *Id.* at 39-42 (89900DOC00051153-56). This section describes the minimum step voltage, the receipt of VID codes, requirements for deep sleep voltage settings, and suggested designs for the "Deeper Sleep" voltage function. *Id.* Other pages address the use of adaptive or active voltage positioning. *Id.* at 48 (89900DOC0051162) (suggesting adaptive voltage positioning to minimize the quantity of certain "bulk-decoupling capacitors"); 50 (89900DOC00051164) (same).

Walters states that while Exhibit 1 to Rodriguez's Declaration contains some design information to show where voltage regulators interact with a microprocessor, it is rudimentary information as opposed to details that would allow a person to create a copy of an Intel microprocessor. Walters Decl. ¶ 12a. Neither he nor Plaintiffs cite to a particular page within the eighty-page exhibit to support his assertion. As to the statements in this document regarding adaptive voltage positioning, Walters states that this phrase is an Intel synonym for voltage droop, which is the loss in output voltage from a device as it drives a current or load. *Id.* Voltage droop, according to Walters, has been practiced "well before" the IMVP specifications were shared with him. *Id.* He asserts that this information is "stale" because it has been in the public domain for some time. *Id.*

Next, Rodriguez describes a July 2, 2002 email to Walters with an attached file which was an Intel Restricted Sheet presentation prepared by Rodriguez and a colleague addressing "IMVP-5 Prescott & NewNWD Power Delivery Overview" and which illustrated IMVP-5 power enabling challenges and specifically referred to using a "Thermal Monitor" to adjust the operation of the voltage regular based on temperature. Rodriguez Decl. ¶ 16 (citing Ex. 3 to Rodriguez Decl. at 4 (8900DOC00051309) (noting that the purpose of the outline was to

"Illustrate IMVP5 power enabling challenges w.r.t. CRB and Customer use"); 8 (89900DOC00051313) (discussing the "VR_TT# Thermal Monitor" as a "NEW IMVP Design Feature[] in IMVP5"); 14 (89900DOC00051319) (noting that one of the "Next Steps" would be to "[l]everage [Intel's] thermal monitoring expertise")). Walters states that the thermal monitoring references in Exhibit 3 to Rodriguez's Declaration have no apparent relation to the FIVR technology at issue in this litigation. Walters Decl. ¶ 12c. He notes that the documents show that Defendant acknowledges thermal limitations on its microprocessors, especially in laptops, and explain an operation to prevent overheating in the computer, meaning a protective function responsive to a particular temperature limit. *Id.*

In another example, Rodriguez describes an April 25, 2003 email to Walters containing minutes of meetings of an Enabling Committee for IMVP5, and also attaching a document entitled IMVP6 Tradeoffs which shows data for a later version of IMVP called IMVP6 and the implications of implementing IMVP6 either with or without thermal relief. Rodriguez Decl. ¶ 17 (citing Ex. 4 to Rodriguez Decl.); *see also* Rodriguez Decl., Ex. 4 at 2 (8900DOC00051366) (showing Walters as a presenter at the meeting); 22-25 (8900DOC00051386-89) (showing IMVP6 "options" or tradeoffs). In regard to Exhibit 4 to the Rodriguez Declaration, Walters states that this exhibit does not affect any infringement analysis in the litigation and discloses only a discussion regarding a protective function to prevent overheating. Walters Decl. ¶ 12c.

Rodriguez also describes a November 19, 2002 email sent by a colleague to Walters as well as to Rodriguez and others at Intel and Intersil with a subject line "Now the down side: IMVP-5 Update from Intel." Rodriguez Decl. ¶ 18 (citing Rodriguez Decl., Ex. 5). This email discusses "several issues" that Defendant found with an Intersil voltage regulator, including one

related to a "voltage droop or undershoot below the specification." Rodriguez Decl., Ex. 5 (89900DOC00051234-35). Walters states that Exhibit 5 addresses issues discovered in an Intersil prototype regulator which was rushed through design and assembly before Intersil could validate the design. Walters Decl. ¶ 12d. The issues were resolved in subsequent regulators. *Id.* According to Walters, this information has no bearing on the infringement analysis in this litigation. *Id.*

Despite Walters's assertions that these documents do not affect the infringement analysis or are unrelated to FIVR technology, Defendants point to specific allegations in the Complaint which cite to voltage regulator features at issue in the litigation which were disclosed in the confidential information received by Walters. *E.g.*, Compl. ¶ 43 ("A FIVR produces an output load voltage specified by the VID reference code"); ¶ 47 ("The droop function, also known as load line or active voltage positioning, is used in a voltage regulator to automatically lower the output voltage based on the output current"); ¶ 57 ("[T]he temperature data is used by the calibration control circuit that is a part of each of the Infringing Products to adjust sense outputs and droop outputs").

The record supports a conclusion that the confidential information concerning Defendant's IMVP technology and provided to Walters from 1999 to 2009 is reasonably related to the FIVR technology at issue in the infringement claim. Both parties agree that the confidential information included specifications for how Defendant's third-party suppliers were to produce voltage regulators using IMVP technology that would be compatible with Defendant's microprocessors. While Plaintiffs choose to characterize the information as "technical" or "specifications," suggesting these were just manufacturing instructions or parameters, Defendant

chooses to characterize the information as "design" related and information which revealed technology decisions. I do not view these terms in such black or white concepts. Instead, information regarding how a third-party supplier is to produce a voltage regulator that will work with Defendant's microprocessor inherently concerns the design and functionality of the voltage regulator as well as the microprocessor. It is reasonable to conclude that the provision of specifications and technical information is capable of transmitting technological design concepts and information. Additionally, the record shows a long-term relationship between Walters and Defendant concerning voltage regulators. It also shows that during that relationship, IMVP went through progressive iterations. Given the length of the relationship which allowed Walters to review confidential information regarding progressive versions of the IMVP technology, it is reasonable to find that the technical information and specifications imparted IMVP design information.

In fact, in describing Exhibit 5 to the Rodriguez Declaration which concerned issues related to an Intersil prototype voltage regulator, Walters states that the prototype was "rushed through design and assembly to Intel before Intersil was able to validate the design." Walters Decl. ¶ 12d. With this, Walters indicates that Intersil was in fact involved in the design of voltage regulators for Defendant. The processing of designing voltage regulators for Defendant's microprocessors requires knowledge of the relevant voltage regulator technology and how it relates to Defendant's microprocessor. It is reasonable to assume that Walters acquired knowledge of Defendant's microprocessor design along with the relevant voltage regulator technology. In another example, Exhibit 1 to the Rodriguez Declaration includes, among other things, suggested designs for the "Deeper Sleep" voltage function. Rodriguez Decl., Ex. 1 at 42.

And, during oral argument, Defendant's counsel pointed to another page of Exhibit 1 which contains a section entitled "Voltage Regulator Design Guidelines." *Id.* at 64 (89900DOC00051178). Thus, evidence in the record indicates that in addition to what Walters refers to as specifications and technical information, he did in fact receive IMVP design information.

Defendant has met its burden of establishing that the information it disclosed to Walters is relevant to the current litigation.

III. Relative Prejudice and Impact on the Integrity of the Legal Process

Plaintiffs assert that they will be substantially prejudiced by Walters's disqualification because it is "not a slight undertaking to find an expert in the field of voltage regulation who is willing to testify against Intel." Pls.' Resp. 13. Plaintiffs state that they spoke with many experts who either worked for parties with relationships with Defendant or worked for universities which received large grants from Intel. However, they provide no details regarding these contacts and their assertion is unsupported by a declaration or an affidavit. They also assert that given the August 13, 2018 deadline for infringement contentions, it is unworkable for them to find another expert.

Defendants cite to other patent cases against it, including one involving FIVR technology, in which experts without a relationship to Intel have testified. Def.'s Reply 9, ECF 69. They also note that even without Walters, Plaintiffs have reviewed Defendant's technical documents, including source code, and have taken a technically detailed, full-day deposition of Defendant's lead FIVR designer. Defendant asserts it will be substantially prejudiced because without disqualification, Plaintiffs will be able to rely on Walters's use of confidential information

Walters once promised to use only for Defendant's benefit, against Defendant. This will allow Plaintiffs to obtain an unfair advantage because Walters may generate opinions based on information he received confidentially, outside of discovery. Finally, Defendant notes that because Walters is now an independent consultant, he could easily go to work for an Intel competitor on voltage regulator technology issues after receiving Intel's latest design technology. Plaintiffs state that Walters has no plans to be active in that area.

This case is at a relatively early stage, having been filed in February 2018. Discovery is ongoing and claim construction opening briefs, at the time the disqualification motion was filed, were not due to the Court until January 2019. At the end of the August 15, 2018 oral argument, I extended the case deadlines, including Plaintiffs' deadline to disclose infringement contentions. I gave Plaintiffs until November 15, 2018 to submit an amended disclosure of asserted claims and infringement contentions. Given the extension of the deadlines, I find that Plaintiffs will suffer relatively little prejudice by having to locate a new expert. *See Broadcom*, 2010 WL 11465478, at *4 (finding that disqualification presented little prejudice to defendant because, among other reasons, the case was at a relatively early stage and thus, the retention of another expert was unlikely to disrupt the case schedule). Additionally, because Plaintiffs failed to support their alleged inability to find another qualified expert with any specific detail, they have not established sufficient prejudice to overcome the prejudice to Defendant by allowing Walters to serve as Plaintiffs' expert after having received confidential information relevant to the technology at issue from Defendant during a ten-year confidential relationship. *See Auto-Kaps*, 2016 WL 1122037, at *4 (court rejected prejudice argument where the party seeking approval of expert "ha[d] not presented evidence" that there "are few experts on the topic").

22 - OPINION

Finally, as to the integrity of the legal process, courts look to the incentives that would be created by the grant or denial of disqualification of an expert. *CreAgri, Inc. v. Pinnaclife, Inc.*, No. 5:11-cv-06635-LHK, 2013 WL 6700395, at *10 (N.D. Cal. Dec. 18, 2013). Notable here is that Walters's relationship with Defendant preexisted this litigation and "came to a natural end" before the litigation commenced. *See id.* Thus, it is unlikely that "ill incentives," to either retain "an expert solely for the purpose of preempting access to that expert by opposing counsel," or to fail to "withdraw a previously designated expert while litigation is pending for fear that the party's confidential information would become available to its adversary," will occur. *Id.* (internal quotation marks omitted)

Defendant satisfies the three-part test for disqualification. Thus, I grant the motion to disqualify Walters.

Dated this _____ day of _____, 2018

Marco A. Hernandez
United States District Judge